v. Hungerford May it please the Court, good morning. My name is Celia Rhoades with the Federal Public Defender's Office and I represent Mr. Hungerford. This case is about the EB-5 Immigrant Investor Program and the web of agency regulations governing it. Prosecutors allege that Mr. Hungerford and his business partner misrepresented to foreign investors that they were running a legitimate and compliant EB-5 Venture Capital Fund, when in reality they were violating what the government called sacrosanct agency rules and regulations related to investment structure and spending. With my limited time, I'd like to first focus on what I see as the Jan Lyons to shoehorn into evidence the government's preferred view of this regulatory scheme while evading the safeguards of Rule 702. That witness served as an agency spokesman who could authoritatively condemn the appellant's actions on the government's behalf and he testified for nearly three hours on direct examination alone with the sole purpose of his testimony being to explain and interpret this regulatory framework as he saw it, apply his view of the law to the of Rule 701 under binding case law like Elma Zane, Griffin, Riddle, and Taxotere. Lay witnesses cannot testify to their understanding of the law and what it requires. They can't apply the law to hypotheticals and the facts of a case. Certainly a lay agency witness can't state legal tests or standards or relay how his agency applies those standards and most fundamentally agency witnesses can't opine on the propriety and the legality of the defendant's hours on end. He described the complex regulatory scheme and the many rules governing the EB-5 program, how USCIS interprets and applies those rules. He opined on how money can and can't be spent, where exactly it has to go, what types of entities are eligible to receive capital and where requisite jobs have to be created and those were all central issues in this case. And he not only described those legal tests and standards but he opined on their application to hypotheticals posed by the prosecution explaining what was and wasn't permitted in his agency's view and he also opined on what type of conduct or fund structuring would suggest fraud to USCIS including the structure used in this case which he called a red flag. He also called those views sacrosanct beyond reproach and worst of all he opined at length on the propriety of the appellant's conduct according to his sacrosanct view of the law. For example he told the jury that none of the investor's money could be spent on things like consulting fees or fund management fees which were central but none of the money could be used for loans which was another central dispute and he agreed with the prosecution that all of the investor's money had to quote go to Orleans Parish and nowhere else and that all work paid for by those funds had to be there as well. Now I think the government is trying to inject uncertainty into this issue where there is none saying well maybe this particular chapter of the Code of Federal Regulations is somehow not sufficiently complex to trigger binding cases like Riddle and Elma Zane but there's no support for that distinction either in the case law or in the record in the facts of this case. First this court has already held that agency officials interpreting and applying agency regulations particularly to a defendant's actions falls outside Rule 701. In fact that's clear and obvious error under Elma Zane but even setting that aside the government offers no basis for its argument that the law in this case is somehow so simple that Riddle and Elma Zane somehow cease to apply and it's clearly not simple. It took Lyons three hours on direct alone to explain this regulatory scheme. He admitted that many of these rules and their application are subjective meaning subject to many interpretations. At one point he even said it gets kind of funky as to what the law is meaning it's not straightforward or easy to understand and he's right because this scheme involves immigration law, complex agency procedures, application of economic multipliers and formulas and many evolving legal tests and that's apparent at record page 8426 which is 95 pages of agency guidance just attempting to explain its own regulations to the public. Guidance as we've pointed out that directly conflicts with the government's own interpretation of their meaning in this very case and that complexity is why this record is so huge. 15,000 pages of exhibits alone because each immigration application had to be accompanied by hundreds and hundreds of pages of documentation just to demonstrate that these multiple complex EB-5 rules have been satisfied. That included financial forecasting, business plans, macroeconomic analysis. Lyons even testified that to show that you're complying you often have to submit export reports to USCIS to show your compliance. There's also nothing straightforward about a regulatory scheme that changes meaning from administration to administration which is why at record page 8564 we can see two branches of government, Congress and Secretary Mayorkas fighting over the meaning of these very rules as the facts of this case are happening and presumably that complexity and disagreement is why the record is so huge. In addition to that they didn't introduce him as an employee of a company. They introduced him as a senior economist with 20 years of experience in finance with degrees from Northwestern and the University of London. You do describe in your reply brief, pardon me, you describe Lyons as the star witness for the government. Can you unpack that a little bit for us? How so? Sure. I think Riddle helps understand this. I think you're getting at prejudice a little bit maybe, Hunter. I think that the government's case from start to finish was the idea that the misrepresentations in this case, first of all, were evidenced by the fact that they said this is a compliant program. The fact that they said Baynola management is an eligible JCE when in the government's view it wasn't. The central theory of this case for the government was the number one misrepresentation to immigrant investors is we're doing this in compliance with EB-5. That also was evidence of specific intent to defraud. Look, they knew they couldn't violate all those rules and yet they did. He was the only witness who could authoritatively get on the stand and back the government up. Throughout this entire trial, the government said, hey, they can't use this money on loans. They can't use this money to go to a company that they own, which frankly is not correct under the regulations. They can't use this money to pay for management fees when in fact the contract specifically says that the job creating entities can pay for management fees. The prosecution had a problem where they have to identify a specific misrepresentation. In this case, their number one misrepresentation, the core of their case, was that this was an EB-5 compliant program when it wasn't. Lyons was the only person who could authoritatively testify to that and then also go through the laundry list of rules that the prosecution had identified and see that. This is why Riddle points out in a very similar situation, just because that there's other reasons, doesn't mean that this isn't the skeleton of the case. They had an equally applicable discussion where what prejudice means in a case like this, where agency regulations are at the center and agency regulations are so entwined with the idea of misrepresentations and intent. I'm just trying to pinpoint what critical pieces of testimony were provided by Lyons that appeared nowhere else. The idea that under USCIS regulations, you could not pay for things like management fees. Things like that every single job, the work had to be done in Orleans Parish, that all of the jobs had to be created there. He testified that it would be a red flag if funds are structured in this way, where money goes into the job creating entities and then goes to other job creating entities. We've listed a whole laundry list of them, but I can go through explaining the idea that Bainolo Management couldn't be creating indirect jobs, for example, I think which was the appellant's theory, because it wasn't physically located in New Orleans. Saying a PO box, for example, can't qualify something as principally doing business in the regional center area, which I think frankly isn't true under the regulations because day-to-day operations is only one question. Saying that investor money can't be spent on things like consulting fees, because the whole theory of this case was that, look, yeah, this money is going into Bainolo Management, but it's an eligible job creating entity and it's providing consulting for the other job creating entities. He said, full stop, that doesn't matter. The jury wasn't even given an opportunity to get to those other subsidiary issues about government had to do was say, look what he did, and this was in the indictment, I mean, this is the first overt act listed in the indictment, look, they held out this to be a compliant EB-5 program, they held Bainolo out to be a compliant and eligible job creating entity, and they weren't. They were able to sort of cut all of the other evidence off at the pass, because you end the case there. The jury had lions to tell them, look, the government's right, this is what the rules say, they violated the rules, and therefore we have wire fraud. And so based on all that, there's at least a reasonable probability that the result of these proceedings would have been different, but for this error. Because this was the evidence for the requisite scheme to defraud, specific intent to defraud, knowing misrepresentations, which was all evidenced by what lion's testimony got to. And I think that we can also see all this by the fact, and back to your star witness question, the fact that the very first witness that the government highlighted in closing was Dan Lyons. He was how they framed their entire case to the jury, and that's at record page 3962. You heard from Dan Lyons, he's a senior economic advisor for USCIS. He told you the rules for this program were simple, and the rules never changed. And then the prosecutor went through that laundry list of lion's rules, Mr. Lyons didn't say you could spend investor money for startup, for overhead, for paying yourself back, which I think is not correct under the regulations. He said most people have no problem following these rules. The defendants ignored these rules and exploited the program, and in doing so, they committed the following crimes. So that was the premise of the crimes that they relied on. In rebuttal, the prosecution went even further, essentially deifying this agency, and federal bureaucrats like Dan Lyons saying, there's a hero somewhere in the bureaucracy who just decided to do their job. Your taxpayer money at work, they messed with the wrong agency. So in other words, the administrative state was both the star witness and hero of the story, and the government's star witness on the stand. And so the way I see this is this was essentially a prosecution by administrative fiat. The executive branch simultaneously enforcing the law and interpreting it from the witness stand with no 702 protections. And to me, that highlights not just prejudice like we were talking about, but also why it's so important for this court to correct this error. The government evaded critical evidentiary checks meant to place reasonable limits on and ensure the reliability of testimony exactly like that. And this should concern us in any context, because this wasn't just run-of-the-mill legal testimony, which in and of itself is improper. Regulatory schemes are not static and sacrosanct like Dan Lyons claimed. They're unpredictable and ever-changing, because they're constantly being reinterpreted by people like Dan Lyons. So it's deeply concerning that we would allow the government to confer upon someone an aura of expertise without ensuring that his testimony was at least reliable. And the record makes clear that this agency in particular could not be trusted to reliably and consistently interpret the law as evidenced by that conflict between Congress and Secretary Mayorkas. So this error not only seriously calls the validity of the jury verdict into question, because removing Dan Lyons' testimony, this is a fundamentally different case. This is one about corporate mismanagement, breach of contract. Not only that, this is exactly the type of error that could and should undermine our confidence in the fairness, integrity, and public reputation of judicial proceedings. And if the court doesn't have any other questions on that. Thank you very much. I only have two minutes left, so I'll just very quickly highlight what I see to be the most impactful instructional error, which was that incorrect ignorance of the law instruction on record page 667. And to me, that error perfectly complemented the 702 evidentiary error. Because during trial, the jury was told in no uncertain terms what the Code of Federal Regulation requires and how it applies to the appellant's conduct. And then the jury was told that the appellant's ignorance or even mistake as to that complex law was no defense at all. And that unquestionably was an incorrect statement of the law. What's worse, it improperly prohibited the jury from even considering this good faith defense that the appellants were reasonably putting forward. The phrase ignorance of the law is no excuse is not a legal rule. It's reference to a complex mens rea concept. The rule correctly stated is ignorance of the law is generally no excuse when the appellant claims to be unaware of the existence of the charged statute criminalizing his conduct. But mistake of law always is a defense when that mistake concerns a misunderstanding of a legal matter that's relevant to knowledge, intent, or good faith. And the classic example which we have here is ignorance or mistake not as to what the charge statute prescribes, but to a collateral legal matter that's relevant to knowledge and intent. And that's exactly what these EB-5 regulations were, and it's exactly what the government was using to weaponize against the defendants. So when the prosecution says, for example, you knowingly misrepresented that your venture capital fund complied with EB-5 regulations, which is exactly what the prosecution claimed, it's a lawful defense to say I was ignorant or mistaken as to that noncompliance because the misstatement ceases to be knowing. So this instruction was clearly wrong. And I think Rehafe gives the best overview of this concept and describes this exact confusion, but this isn't new law. Rehafe's discussion is based on well-known common law mens rea concepts, which is why this court long ago in Davis already answered this exact question. The court explicitly warned that district courts may not instruct that ignorance of the law is no excuse because ignorance of the law may go to the heart of specific intent, which is exactly what it did in this case. Okay. Thank you, counsel. And you've reserved some rebuttal time as well. Okay. Mr. Daly, we'll hear from the government. May it please the court, Kyle Daly for the government. This is an investment fraud case that involves the EB-5 immigrant investor program, and we spent in our brief 66 pages on this U.S. officials' testimony and whether or not it violated, whether it should have been qualified as an expert. So I won't go over those 66 pages again, but I would like to point out a couple of things. This court's recent decision in Mopardi from 2021 demonstrates that there's no clear or obvious error in the admission of this testimony. Mopardi doesn't have to use an expert to explain the basics of a government program to the jury. The official was drawing on his work experience to explain how he uses, administers that program. His testimony was not, based on the questions that were asked and the way the answers were about the U.S.'s regulations, the particulars of the U.S.'s regulations came up really in cross-examination when the defense was asking him to read U.S.'s regulations and agree with their various interpretations of the U.S.'s regulations. But Jan Lyons was trying to tell the jury about how this program works because otherwise all these documents that they're seeing and various testimony about aspects of how the  So he was . . . that impresses your use of the Jan Lyons testimony at trial? Mopardi. The only difference between Mopardi is that it was witnesses testifying about a private industry versus a government program, but it's the same kind of business, policies, practices, procedures, how they look at certain circumstances. And when the defense wanted to point out that, you know, the particular language of a particular regulation didn't jive exactly with how Mr. Lyons testified that they looked at something, they were able to do that. So this was not a plain or obvious error. The subject matter here was not particularly complex. It wasn't like in Riddle where he's . . . where the witness is on the stand for more than a day opining about how they violated bank regulations and caused the bank to fail. And much of his testimony, the crux of his testimony was consistent with what the defendant has told everybody outside of NLR, that they would not pay themselves with investor capital. They told investors that, they told accusers that, they . . . Vonda Kirby, one of the immigration attorneys, testified at length about a book that he published that included, you know, their description of how the program worked, and if you compare that with Jan Lyons testimony, it's very similar. So there's no clear or obvious error here. Certainly not one that's affected, I'll refer to substantial rights, or requires this Court to reverse. Regarding the ignorance of the law instruction, there's a dispute as to what standard we're on. This is plain error review. When the district court asked for the defendant's objections at the end of the trial, they mentioned three proposed instructions that they wanted the district court to give. They made no mention of the ignorance of the law instruction, or the good faith instruction that immediately followed that instruction. So the argument that they're making here on appeal was not made in the district court. But regardless, there's no error for the reasons that this Court stated in Brooks, where there was no error. Hungerford was not charged under a highly technical statute, so that statement, ignorance of the law is no excuse, is a correct statement of law. The instructions as a whole included, of course, intent to defraud, and allowed for an acquittal based on good faith. In Brooks, there actually wasn't a good faith instruction, and this Court found that there was no error. Here, there actually was a good faith instruction that immediately followed it. The district court allowed them to argue extensively that their conduct was in good faith. The government certainly didn't suggest that any reliance on useless regulations was not a defense. The jury didn't express any confusion regarding the ignorance of the law instruction, or the good faith instruction. They asked several questions, that was not one of them. And the defendants in their testimony didn't really rely on the useless regulations to explain why they did what they did, and why Hungerford wrote $6 million in what he called loan checks to himself and to Milbrath. They didn't say that they reviewed any regulation and relied on that. That was really just a, you know, that was part of the cross-examination of Jan Lyons, but the defendants themselves didn't claim that that was, that they interpreted a particular regulation in any particular manner that caused them to act the way that they did. So there's no plain or obvious error there. And if this Court has no further questions . . . Well, Counselor, let me ask you about the Yvonne Evans testimony. If I'm not mistaken, she is a forensic accountant. Do you agree that this witness was offered as a . . . could be characterized as a summary witness? Yes. She was characterized as a summary witness, and she was also a fact witness, because she traced all of the money to where it went. Okay. I was going to ask you how you responded to the assertion that new evidence was introduced during her time on the stand. Is that your response to it, is that she was also a fact witness, or is there something more that we need to know about that? No. The thing is that this . . . that she relied on documents that were introduced during her testimony. Now, if we're getting into the nitty-gritty, she was not the person to authenticate all these documents, but the Court was telling the parties, move things along, and so there was a stipulation regarding authenticity. So certain aspects of her testimony touched on documents that were in evidence, not up until the moment that she started testifying about them. That didn't cause the defendant any prejudice. It was just a way for the trial to be moved along. This is really just kind of an after-the-fact sort of argument that didn't really come up at trial. There was one issue with one of the private investors, outside investors, who gave money to NOR, and that came up during defense cross-examination, and she touched upon that. But that was something that they opened up, and those . . . it was based on emails that had been sent between that investor and Hungerford himself. So those documents, that email, could have gotten in any way, particularly through Hungerford's testimony. But these are all . . . all these records that they're complaining were introduced into evidence were the same as all the records that had been introduced into evidence. These are NOR documents, these are bank records, these are . . . they certainly haven't established that any of these records were actually inadmissible. And they weren't. If the Court doesn't have any other questions, we respectfully ask that you affirm. Thank you. Thank you very much. Ms. Roge, you have five minutes. That's right. Counsel, with regard to the Jan Lyons testimony, you made reference to testimony regarding rules governing either compensation or reimbursement or expenditures, that that was impermissible testimony. Do you disagree with any of the statements that Jan Lyons made? Were those outrightly wrong statements, or you're just saying they're not permissible from that witness? I think they're . . . first, they're not permissible, and so I don't think we would necessarily need to show that they're incorrect. However, no, I do think a lot of them are incorrect. So he said, for example, that he was claiming at one point that indirect jobs have to be located in the regional center area and that all the work has to be done there. And USCIS regulations at 8461 to 62, indirect jobs can qualify and be counted as jobs attributable to a regional center based on reasonable economic methodologies, even if they are located outside the geographic boundaries of the regional center. The prosecution used his testimony about loans, suggesting they couldn't pay themselves back for loans. At 8459 of the record, those are the regulations, they talk about bridge financing. Commercial enterprises can use interim, temporary, or bridge financing in the form of debt or equity, which then can be replaced by EB-5 funds in any of the jobs created with that loan. Commercial loans can then be counted towards the requisite job requirement. He also testified, and this was truly the central issue in this case, whether a P.O. box qualifies as a . . . means that a company can qualify as a job-creating entity, and he said flat out no. But if you go to the principally doing business standard at 8488, the question of day-to-day operations is only one of many factors. The ultimate question is the location where the company regularly, systematically, and continuously provides goods or services that support job creation, and unquestionably, the work of Bainola management was done for companies. They're consulting with companies in New Orleans, doing construction consulting, consulting on restaurants, and they're selecting . . . they're the managers of this venture capital fund, which has to be managed, right? A venture capital fund doesn't manage itself. They're the ones doing risk assessment for the investments. They're the ones who are hiring contractors to come do project management on the ground in New Orleans, and so I think unquestionably, they were regularly and systematically doing business in New Orleans. So, yes, I think that this was damaging no matter what, and under cases like Elmazain and Riddle, it's error, and it's clear error, but it's particularly damaging because a lot of it was incorrect. I want to clarify one thing that the government said, and they've said this a lot in their memo below, which is the idea that where investor money must go. The full $500,000 has to be put at risk in a new commercial enterprise, which is the fund. From there, all of the $500,000 has to go to job creating entities or portfolio projects of the investment fund, and that happened. They went to places like 3PJ's Coffee Shops, a restaurant in the Bywater, a restaurant in the French Quarter, and they went to Bainola management. The question is just whether Bainola management was eligible to receive those funds. So when the defendant said, yeah, all of the $500,000 had to go into the new commercial enterprise, it did. I don't think anybody's disputing that. The question is where it went from there when it was distributed, and, Your Honor, I believe you asked for their best case blessing, this testimony, and they gave Mokherdi, but then said, well, that's exactly on point except for the fact that it was not a government official. It was a corporate officer. We already have the answer to the question of whether there's a distinction between those two, because Riddle and El-Mazain have directly held on point that agency officials cannot testify to agency regulations, much less apply it. In fact, El-Mazain, the two reasons why they didn't reverse in that case after finding clear and obvious error was, one, the witness didn't apply his view of the regulations specifically to the appellant's conduct, which was done extensively in this case, and, two, because the government did the right thing in that case. The government actually brought onto the stand an expert, gave notice, qualified that expert, made sure that expert was reliable, and the lay witness testimony was fully coterminous with the actual expert's testimony. The government didn't do that, and they can't now seek to qualify Lyons as an expert on appeal even if every single word that he had said was correct. That evidence was impermissible, and it needs to be excised from the record, and then the that the jury's verdict would have been different, and absolutely there is a reasonable probability because there's central misrepresentations, according to the government, and their central intent was evidenced by Lyons' quote, rules, as the government put it in closing. So we would ask that the court reverse or order a new trial. Okay. Thank you, counsel. The case is submitted.